*U.S. v. Hammoud*
3:00-cr-147-1-MU

# Exhibit 5
# to
# Defendant's Supplemental Submission Regarding Matthew Levitt

# Matthew A. Levitt
The Washington Institute for Near East Policy. 1828 L Street NW, Suite 1050 Washington DC 20036
(W) 202-452-0650 • email: mattl@washingtoninstitute.org

## Experience:

**The Washington Institute for Near East Policy**  Washington, DC
*Senior Fellow in Terrorism Studies*  Nov. 2001 - Present
- Terrorism expert focused on terrorism, the Middle East and U.S. policy
- Frequent commentator for major media outlets
- Consultant lecturer for organizations including the U.S. Departments of Justice and State, NATO and others

**Federal Bureau of Investigation**, International Terrorism Intelligence Unit  Washington, DC
*Intelligence Research Specialist*  Nov. 1998-Nov. 2001
- Provided tactical and strategic analysis in support of FBI counterterrorism operations
- Researched and analyzed trends and patterns of international terrorist groups
- Produced written products and oral presentations for FBI management, FBI field agents and other agencies
- Liaised with U.S. intelligence community counterparts, other U.S. government agencies, and foreign services

**The Washington Institute for Near East Policy**  Washington, DC
*Soref Fellow*  Sep. - Nov. 1998
- Analyst focused on the Middle East peace process, terrorism and Palestinian politics and society
- Left institute early when security clearances came through for counterterroism position with the FBI

**The Program on Negotiation at Harvard Law School**  Cambridge, MA
*Graduate Fellow*  1997-1998
- Awarded doctoral fellowship to pursue field research in the Middle East and commence writing of thesis on the impact of acute security crises on the process of ongoing negotiations.
- Traveled extensively in Israel, the West Bank and Gaza conducting 66 interviews for the dissertation

## Education:

**United States Government**  Washington, DC
- Completed a variety of U.S. intelligence community training courses  1998-Present

**Tufts University, The Fletcher School of Law and Diplomacy**  Medford, MA
- Ph.D. Candidate in International Relations (ABD) currently completing dissertation  (expected 2002)
- Master of Arts in Law and Diplomacy (M.A.L.D.)  May 1995

Concentrations: Negotiation and Conflict Resolution, International Security Studies, the Middle East

**Yeshiva University**  New York, NY
BA *cum laude* in Political Science  June 1992

## Honors:

- Letters of Commendation from Deputy Assistant Directors, Federal Bureau of Investigation, July 2000, August 2000, July 200L

- Time Off Awards, Federal Bureau of Investigation, April 2000, April 2001

- Performance Awards, Federal Bureau of Investigation, December 1999, November 2000

- Special Act or Service Award, Federal Bureau of Investigation, September 1999

- Graduate Research Fellow, The Program On Negotiation at Harvard Law School, 1997-1998

- International Security Studies Fellow, International Security Studies Ph.D. Dissertation Fellowship, The Fletcher School of Law and Diplomacy, 1996-1997

- International Security Studies Program Graduate Student Research Grant on the Emerging Issues of Ethnic, Sectarian, and Religious Conflict, William H. Donner Foundation, 1996

- Doctoral Scholarship, The Fletcher School of Law and Diplomacy, 1995-1996

- Sarah Scaife Frank Rockwell Barnett Memorial Grant in International Security Studies, The Fletcher School of Law and Diplomacy, 1994 and 1996

**Publications:**

- "Cracking Down on Terrorist Financing," *Harvard International Review* (Spring 2002) Forthcoming

- "Responding to September 11, and Looking Beyond," *Middle East Quarterly* (Spring 2002) Forthcoming

- "Words and Actions: Leading by Example;" "Assessing Arafat's Performance in the Fight Against Terror;" and "Navigating the U.S. Government's Terrorist Lists" in Peacewatch/Policywatch Anthology 2001: A Year of Terror (Washington, DC: The Washington Institute for Near East Policy, 1999), p. 174, 186, 423

- A variety of classified articles published in FBI and U.S. intelligence community publications, 1998-2001

- "U.S. Mediation in the Peace Process: Context for the Ross Mission," and "Human Rights in the Wye River Memorandum," in Peacewatch/Policywatch Anthology 1998: Inching Toward Peace, Inching Toward War (Washington, DC: The Washington Institute for Near East Policy, 1999), p. 78, 112

- "The Taliban, Islam, and Women's Rights in the Muslim World," *The Fletcher Forum of World Affairs*, vol. 21, no. 1 (Winter/Spring 1998)

- "Kilometer 101: Oasis or Mirage? An Analysis of Third-Party Self-Interest in International Mediation," *Mediation Quarterly*, vol. 15, no. 2, (Winter 1998); earlier version published in The Program on Negotiation at Harvard Law School, *Working Paper Series*, no. 96-1 (March 1996), and presented at a Ph.D. conference entitled "Conflict Studies: A New Generation of Ideas" held at The University of Massachusetts, Boston, MA, October 4-5, 1996.

- Academic Book Review of Faith and Freedom: Women's Human Rights in the Muslim World, Mahnaz Afkhami, Ed. (Syracuse University Press, 1995), *Journal of International Affairs*, vol. 50, no. 1 (Summer 1996)

"Let Them Eat Figs: An Analysis of the Negotiation Process Leading to the Madrid Peace Conference," The Program on Negotiation at Harvard Law School, *Working Paper Series*, no. 94-4 (February 1994)

# Matthew A. Levitt
Senior Fellow in Terrorism Studies, The Washington Institute for Near East Policy
**Expert testimony in the case of Mohamed Youssef Hammoud, et al; 3:00CR147-MU**

I.      Qualifications to render expert opinion

My qualifications as a noted expert in international terrorism, with a focus on Middle East terrorist groups and particular expertise in their logistical and financial support networks, are based on a multidisciplinary combination of my academic education, doctoral field research, and professional training and experience.

I hold a Masters of Law and Diplomacy from The Fletcher School of Law and Diplomacy at Tufts University with concentrations in Conflict Resolution, International Security Studies, and the Middle East. The Fletcher School, a member of the Association of Professional Schools of International Affairs and one of the country's preeminent graduate programs in international affairs, is renown for its interdisciplinary curriculum and approach to international studies.

I am currently completing a doctoral dissertation under the auspices of The Fletcher School entitled "The Impact of Acute Security Crises on the Process of Ongoing Negotiations," a study of the impact of terrorism on the Arab-Israeli peace process. I have been awarded several fellowships and grants in support of this research, including a graduate research fellowship from the Program on Negotiation at Harvard Law School. While at Harvard I conducted extensive field research in the West Bank and Gaza Strip.

Prior to joining the Institute, I served as a FBI counterterrorism intelligence analyst providing tactical and strategic analysis in support of counterterrorism operations. There I developed a special focus on fundraising and logistical support networks for Middle East terrorist groups. In addition, I was honored to participate as a team member in a number of crisis situations, including the terrorist threat surrounding the turn of the millennium and the September 11 attacks. In my official capacity as a U.S. government intelligence analyst, I researched and analyzed trends and patterns of international terrorist groups, produced written products and oral presentations for FBI management, FBI field agents and other agencies, and liaised with U.S. intelligence community counterparts, other U.S. government agencies, and foreign services. In this capacity I also made several trips to the Middle East. Indicative of my expertise, I earned three letters of commendation for my analytical contributions to FBI counterterrorism operations, as well as five awards in recognition of superior service rendered to the FBI.

In November 2001 I joined The Washington Institute for Near East Policy as their Senior Fellow in Terrorism Studies. In this capacity I am sought after as a frequent commentator on terrorism for major media outlets including CNN, ABC News, The New York Times, The Washington Post, The Wall Street Journal, National Public Radio, BBC and more. I lecture and consult on terrorism for a variety of government and other organizations, including the U.S. Departments of State and Justice, NATO, and others, and write frequent policy briefs and articles on issues relating to terrorism and U.S. policy.

II.     Expert Opinion

Based on my knowledge, experience, training and education, and after a comprehensive review of the material presented by the US Attorney's Office, it is my expert opinion that Mohamed Hammoud and his co-defendants are in fact Hizballah members and operatives who served as a Hizballah logistical and financial support network for the group's terrorist activity. Together, the FISA and CSIS telephone intercepts, videotapes and literature seized in court-authorized searches of the defendants' homes (particularly the homes of Mohamed Hammoud and Chawki Hammoud), and the statements of the defendants themselves demonstrate that these individuals knowingly and proactively raised funds for Hizballah which they then sent to known Hizballah leaders in Lebanon. These funds were raised through a variety of criminal enterprises, including cigarette smuggling and credit card fraud, by solicitation at the group's Thursday night meetings at Mohammed Hammoud's home, and as a means of fulfilling the Islamic requirement to give zakat (charity, or alms).

It is clear that Hammoud was the central and leading figure in a Hizballah cell – a group associated in fact through its criminal acts, business dealings, group meetings, familial connections, and association with and sympathy for Hizballah. The group's activities are typical of Hizballah logistical and financial support networks throughout the world, and fit known patterns of Hizballah's *modus operandi*.

Mohamad Hammoud and his co-defendants are true Hizballah sympathizers, believers and members. They took affirmative steps to support Hizballah and its terrorist agenda, going far beyond the realm of being good Shi'a Muslims to the point of cooperating in criminal enterprises to support Hizballah, a designated international terrorist group responsible for the deaths of hundreds of Americans. In fact, among the material found in the defendants' possession were not only blatantly anti-American literature, videos and propaganda, but also photographs highlighting the groups' sympathies for Hizballah violence. One photograph features Mohamad Hammoud posing at a Hizballah recruitment center with an AK-47 assault rifle, and another shows Mohamad Atef Darwiche in a militia photo with a rocket-propelled grenade launcher (RPG).

There is no indication that Mohamad Hammoud or other cell members were planning to carry out an act of terrorism of their own. Their primary purpose was to facilitate and support Hizballah's ability to carry out operations in the Middle East. They did, however, possess the ability to support direct action based on their access to false documents, ill-gotten gains, established smuggling network, bribing of officials, and money laundering. Had they decided to carry out an attack, the cell could have called upon its established ability to infiltrate or exfiltrate operatives across borders. Cell members did engage in shooting and target practice, as evidenced by other photographs uncovered in the searches of their homes, and at least one individual affiliated with the procurement aspect of the group's support for Hizballah, Mohamad Hassan Dbouk, is a militant operative trained by the Iranian Islamic Revolutionary Guard Corp (IRGC). It should be noted that in his statement Said Harb noted that at one time he himself became concerned after Haissam Harb was arrested that Mohamad Hammoud was aware that Hizballah was going to "do something."

Based on my expertise, each of the following is a dedicated Hizballah member, supporter, sympathizer and activist: Mohamad Youssef Hammoud; Bassam Youssef Hammoud; Chawki Youssef Hammoud; Mohamad Atef Darwiche; Ali Fayez Darwiche; Mehdi Hachem Moussoui; Said Mohamad Harb; Ali Hussein Darwiche; Ali Adham Amhaz; Mohamd Hassan Dbouk; Hassan Hilu Laqis; and Shiekh Abbas Harake.

### III. Basis for Opinion

Hizballah, designated as a Foreign Terrorist Organization (FTO) by the State Department and a Specially Designated Global Terrorist group (SDGT) by the Treasury Department, is widely known to operate an international logistical and financial support network to further its terrorist agenda. The criminal activity in which Hammoud and his associates engaged, including immigration, RICO, fraud, and material support for terrorism, and other violations, are typical of Hizballah's *modus operandi*. As recently as April 24, 2002, for example, the highly respected *Jane's Defense Weekly* noted that Iranian sponsorship of Hizballah is "augmented by other, extra-legal, fund-gathering activities."[1] In another example, Spanish authorities revealed that police broke up a fraud ring in the Canary Islands suspected of engaging in arms trafficking and terrorist financing for Hizballah, and possibly Amal as well.[2] Hizballah logistical and financial support activity in the tri-border area, where Paraguay, Brazil and Argentina meet, has also been well documented and is known to encompass illegal schemes to funnel money to Hizballah similar to those employed by Hammoud and his associates.[3] Other activity, such as cell members' travel to Venezuela for falsified visas and arranging for each other's falsified marriages, is also typical behavior for international terrorist groups such as Hizballah. According to Said Harb's statement, Hizballah "maintains a presence outside of Lebanon and Hizballah members and supporters outside of Lebanon often collect money and send it to Lebanon to support Hizballah operations."

Also typical of Hizballah's *modus operandi* is the group's procurement of dual use technologies, including sophisticated optical equipment for sighting the placement of roadside bombs, lenses for preoperational surveillance and for filming attacks, binoculars, night vision equipment, computers and more. For example, in July 1998, Fawzi Mustapha Assi was arrested in Detroit for attempting to procure $120,000 in thermal imaging camera gear for Hizballah. Assi jumped bond and escaped to Lebanon. In fact, on September 10, 2001, the day before the September 11 hijackings, Ali Boumelhem was convicted on charges of shipping two shotguns and 750 rounds to Hizballah.

---

[1] Sue Lackey, "Hizbullah Resurgent," *Jane's Defense Weekly* (April 24, 2002), Pp. 20-21
[2] Peter Finn and Pamela Rolfe, "Calls Central to Spain's Sept. 11 Case; Indictment Reveals Cryptic References," Washington Post, (11/21/01), p. A17
[3] See, for example, Stan Lehman, "Paraguayan Hizbullah Suspect Evades Authorities," Associated Press (December 12, 2001); and Blanca Madani, "Hezbollah's Global Finance Network: The Triple Frontier," *Middle East Intelligence Bulletin*, vol. 4, no.1 (January 2002)

It is significant that the majority of the cell members are not only either family members or childhood neighbors, but that they come from known Hizballah strongholds such as Bourj al-Barajneh, near Beirut International Airport, just south of Beirut. Hizballah spiritual leader Sheikh Mohamed Hussein Fadlallah is known to be closely affiliated with the neighborhood's Hussien Bin Ali Mosque, where he preaches regularly.

It should be noted that a number of the Hizballah cell members in Charlotte started out as members of the Shi'a Amal movement and later switched allegiances to Hizballah. As noted in Said Mohamad Harb's own statement, this was not uncommon. What began as a Shi'a social protest movement developed into a political party under the Amal movement. Given Amal's relative secularism, it was not uncommon for members to drift toward Hizballah. A number of Amal officials played important roles in the Iranian revolution, and later became the core of Hizballah, the primary terrorist proxy groups of the revolutionary regime in Iran.

By his own admission, Mohamad Hammoud not only is a follower of Sheikh Fadalallah, but also has contacted the Hizballah leader several times from the United States. More significantly, Hammoud stated that he sends funds via couriers to Sheikh Mohammed Hussein – a clear reference to Sheikh Mohammed Hussein Fadlallah.[4] Said Harb noted that Mohamad Hammoud would play tapes of Hizballah speeches and videotapes of successful Hizballah operations and then solicit donations for "the resistance," which Harb correctly identified as the "Hizballah military branch."

Not only was Mohamad Hammoud as associate of Sheikh Fadlallah, the cell was answering directly to two senior Hizballah commanders. As the head of the cell's financial support network, Mohamad Hammoud's contact in Lebanon was Sheikh Abbas Hareke, a former teacher of Hammoud's and a known Hizballah military commander for the southern suburbs of Beirut. The Hizballah operatives involved in the procurement of dual-use technologies such as night vision goggles and sophisticated camera equipment, notably Said Mohamad Harb, Ali Adham Amhaz and Mohamad Hassan Dbouk, were directed by a senior Hizballah official in charge of procurment, Haj Hassan Hilu Laqis. Said Harb confirmed both Harake and Laqis' positions within Hizballah, as well as Mohamad Hammoud's close relationship with Harake.

Material found in the searches of Muhamad Hammoud's home make his association with Hizballah and his activities on the group's behalf crystal clear. Many Hizballah videotapes and audiotapes were found, including propaganda films lauding Hizballah suicide and other attacks. Vast amounts of Hizballah literature were found, featuring titles such as "The True Nature of the U.S. Regime, the "Great Satan," and "Ragheb Harb: Our Leader, A Martyr on the way to Al Quds. Islamic Resistance, Lebanon." Pamphlets featured pictures of prominent Hizballah leaders such as Hassan Nasrallah and Muhamad Hussein Fadlallah, as well as Iran's Ayatollah Khomeini. Also

---

[4] In Arab culture it is common to drop a person's last name. In one famous example, then-Secretary of State Henry Kissinger was commonly referred to as "Dr. Henry." Consultation with several experts and linguists confirmed that it would not be uncommon for a Hizballah member/sympathizer to refer to Fadalallah as "Sheikh Mohammed Hussein."

found were letters documenting written communication between Muhamad Hammoud and Hizballah associates in Lebanon. For example, one letter received by Hammoud made of reference of the Thursday evening meetings he hosted, and asked for financial support for Hizballah:

> As you know brother Muhamad, the Resistance is always in need for support and the distinction is that the Resistance's support is on the shoulders of the weak so, if there was an opportunity for you to work as you did at the end of the gatherings, donate to the Resistance, and when one of the guys is coming to Lebanon, especially here in the south, they need the support. And I sent with Hajj Bassam an invitation card to the attendees of the breakfast parties that talks about the accomplishments of the Resistance and the guys could see it and donate to the Resistance. Because we, in Lebanon, live in safety as a result of that, and I will send you a receipt for any amount donated.

Letters congratulate Hammoud on Hizballah military victories, indicating his sympathy for and association with Hizballah. Additionally, letters regularly send regards, via Hammoud, to others involved in the Hizballah cell, highlighting the fact that Hammoud led a RICO-type of group associated in fact.

# Matthew A. Levitt
Senior Fellow in Terrorism Studies, The Washington Institute for Near East Policy
**Response to Defense Motion to Produce Background Material for Expert Witnesses**
Mohamed Youssef Hammoud, et al; 3:00CR-147-MU

The standard questions posed in Defense's motion are not applicable to non-scientific fields of expertise. Nonetheless, the following applies these questions to the social sciences and answers Defense's questions to the greatest extent possible.

The underlying principles used to form Mr. Levitt's expert opinion are personal, academic and intellectual integrity. Mr. Levitt's opinions are based on his professional and academic expertise. Mr. Levitt checks and double checks his information, referring to academic research, published books and journal articles, personal interviews with other experts and individuals from the region, and his own knowledge base as a noted expert in international terrorism, with a focus on Middle East terrorist groups and particular expertise in their logistical and financial support networks.

The thoroughness and veracity of Mr. Levitt's research is evident in all his published works, some of which are available on The Washington Institute's website (www.washingtoninstitute.org) and others are listed in Mr. Levitt's C.V.

Mr. Levitt has received numerous awards and grants for his work, all which were based, in whole or in part, on a positive review of his prior work.

Mr. Levitt has not relied any any empirical studies or data in his testimony. As a government official, Mr. Levitt was precluded from serving as an expert witness until November 2001 when he left government to join the Washington Institute. Therefore, he has not served as an expert witness in any court prior to this trial.

Mr. Levitt relied on his own knowledge, experience, training and education, as well as a comprehensive review of the material presented by the US Attorney's Office in forming his expert opinion. Mr. Levitt also consulted with other experts and academic works in forming his opinion.

Mr. Levitt is receiving financial compensation in the amount of $200/hour, plus expenses such as airfare and hotel accommodations, to facilitate his ability to provide his expert opinion.